**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000370
24-OCT-2018
07:56 AM**

NO. CAAP-17-0000370

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee, v.
MICHAEL E. MICHEL, Defendant-Appellant


APPEAL FROM THE DISTRICT COURT OF THE FIRST CIRCUIT
HONOLULU DIVISION
(CASE NO. 1DTC-16-061202)


SUMMARY DISPOSITION ORDER
(By: Ginoza, Chief Judge, Leonard and Reifurth, JJ.)

Defendant-Appellant Michael E. Michel (**Michel**) appeals from a "Notice of Entry of Judgment and/or Order and Plea/Judgment," entered by the District Court of the First Circuit, Honolulu Division (**district court**),[1] on April 19, 2017. The district court convicted Michel of one count of excessive speeding, in violation of Hawaii Revised Statutes (**HRS**) §§ 291C-105(a)(1)(2) and (c)(1) (2007 & Supp. 2017).[2]

---

[1] The Honorable James C. McWhinnie presided.

[2] HRS § 291C-105 provides, in relevant part:

   **§291C-105 Excessive speeding.** (a) No person shall drive a motor vehicle at a speed exceeding:

   (1) The applicable state or county speed limit by thirty miles per hour or more; or

(continued...)

On appeal, Michel contends: (1) the district court abused its discretion in denying his motion to compel discovery; (2) there was no substantial evidence to support his conviction because Plaintiff-Appellee State of Hawai'i (**State**) failed to lay the required foundation for admission of a laser speed reading and the applicable speed limit; and (3) the district court failed to administer the ultimate <u>Tachibana</u> colloquy.

Upon careful review of the record and the briefs submitted by the parties, and having given due consideration to the arguments advanced and the issues raised, we resolve Michel's points of error as follows and reverse.[3]

Michel argues, among other things, that the district court violated his right to testify by failing to provide him with an "ultimate" <u>Tachibana</u> colloquy, and the omission was not harmless beyond a reasonable doubt. The State concedes these points. However, the State's concession "is not binding upon an appellate court[.]" <u>State v. Hoang</u>, 93 Hawai'i 333, 336, 3 P.3d 499, 502 (2000) (quoting <u>Territory v. Kogami</u>, 37 Haw. 174, 175 (Haw. Terr. 1945)). "[A]ppellate courts have an independent duty 'first to ascertain that the confession of error is supported by the record and well-founded in law and second to determine that such error is properly preserved and prejudicial.'" <u>State v. Veikoso</u>, 102 Hawai'i 219, 221-22, 74 P.3d 575, 577-78 (2003) (quoting <u>Hoang</u>, 93 Hawai'i at 336, 3 P.3d at 502).

The district court erred in failing to provide Michel with a colloquy on his right to testify in accordance with <u>Tachibana v. State</u>, 79 Hawai'i 226, 236, 236 n.7, 900 P.2d 1293, 1303, 1303 n.7 (1995); <u>see also</u> <u>State v. Pomroy</u>, 132 Hawai'i 85,

---

[2](...continued)

    (2)     Eighty miles per hour or more irrespective of the applicable state or county speed limit.

    . . . .

    (c)     Any person who violates this section shall be guilty of a petty misdemeanor. . . .

[3]  We address Michel's arguments out of order for the sake of clarity.

92-93, 319 P.3d 1093, 1101-1102 (2014). Although the district court gave a pre-trial advisement to Michel on his right to testify and his right not to testify, the district court failed to engage in a Tachibana colloquy during trial before the defense rested its case. Because it is impossible to determine what effect the omission had on the outcome of the case, the error was not harmless beyond a reasonable doubt. See Tachibana, 79 Hawai'i at 240, 900 P.2d at 1307.

Although the trial was defective due to the lack of an ultimate Tachibana colloquy, we must review Michel's contention on appeal that there was insufficient evidence to support his conviction before remanding for a new trial. See State v. Davis, 133 Hawai'i 102, 120, 324 P.3d 912, 930 (2014). Based on our review of the record in this case, and considering the applicable case law, the foundation was inadequate for admission of the laser speed reading because the State failed to demonstrate that Officer Russell Maeshiro (**Officer Maeshiro**) was trained in the operation of the LTI UltraLyte laser gun in accordance with the recommendations of the device's manufacturer, Laser Technologies Incorporated (**LTI**). See State v. Amiral, 132 Hawai'i 170, 319 P.3d 1178 (2014); State v. Gonzalez, 128 Hawai'i 314, 327, 288 P.3d 788, 801 (2012); State v. Assaye, 121 Hawai'i 204, 216, 216 P.3d 1227, 1239 (2009).

Officer Maeshiro testified he was initially trained to use the LTI UltraLyte in 1998 at the police academy by Corporal Robert Steiner, and that he also had another class in 2013 "for an update." During Officer Maeshiro's training he used a trainer's manual and an operator's manual, which had the LTI logo and registered trademark. Officer Maeshiro further testified as follows:

> [THE STATE]: And do you know or are you familiar with any manufacturer's requirements regarding the training and operating these types of devices?
>
> [OFFICER MAESHIRO]: Uh, basically we passed the training course on care and maintenance and operation and we take a test at the end of the test -- uh, the class.
>
> [THE STATE]: Okay. Is that training based on the manual?

3

[OFFICER MAESHIRO]: Yes, sir.

On cross-examination, Officer Maeshiro testified that he had no personal knowledge as to whether someone from LTI wrote the 2013 manual he had received with the LTI logo on it. Ultimately, in light of prevailing case law, the record indicates the State adduced insufficient evidence that the manuals Officer Maeshiro was given contained the training procedures approved by LTI or that the training Officer Maeshiro received was consistent with LTI's approved training requirements.

> In <u>Gonzalez</u>, the operative facts were as follows:
>
> Officer Franks testified that he was trained in the use of the laser gun and that he had verified its accuracy on the date in question. Officer Franks' training consisted of "four hours of operator training in January of [2003] in the police academy," and "further training as an instructor by LTI representatives themselves as well as laser instructor currently retired Sergeant Bobby Lung." As to accuracy, Officer Franks explained that at his initial training in the use of the laser gun in 2003, he was provided with a manual "from [LTI]." That manual provides four separate tests "that an operator must do prior to using the laser on the shift." Officer Franks related that he performed all four tests prior to using the laser gun on January 14, 2011.
>
> On cross-examination, Officer Franks testified that although the manual containing the four tests was not the manual that was provided with the laser gun, it did contain both the HPD seal and the LTI copyright. He further recounted that he received additional training directly from LTI personnel, where the LTI personnel reviewed the HPD manual, and that all the information covered by the LTI personnel was replicated in the manual.

128 Hawaiʻi at 316, 288 P.3d at 790.

The Hawaiʻi Supreme Court held the State failed to lay an adequate foundation to admit a laser gun speed reading, because the State did not demonstrate that the citing officer's training met the manufacturer's requirements. The supreme court explained:

> The State introduced no evidence regarding the manufacturer's requirements, and therefore, regardless of the extent of Officer Franks' training, the court could not have properly concluded that the manufacturer's requirements were met.
>
> To lay a sound foundation for the introduction of a reading from a laser gun, <u>Assaye</u> requires the prosecution to demonstrate that "the nature and extent of an officer's training in the operation of the laser gun meets the

4

> requirements indicated by the manufacturer." Assaye, 121 Hawaiʻi at 215, 216 P.3d at 1238. Logically, to meet this burden the prosecution must establish both (1) the requirements indicated by the manufacturer, and (2) the training actually received by the operator of the laser gun.
>
> Here, at trial the State only provided evidence of the extent of Officer Franks' training. Although the State explained that Officer Franks received four hours of training in 2003, and further training in 2009 and 2010, <u>the record is silent as to what type of training is recommended by the manufacturer. Without a showing as to the manufacturer's recommendations, the court could not possibly have determined whether the training received by Officer Franks met "the requirements indicated by the manufacturer</u>." Id.

Id. at 327, 288 P.3d at 801 (emphasis added).

In Amiral, to establish the citing officer was trained in accordance with the laser-gun manufacturer's recommendations, the State adduced the following testimony:

> Officer Ondayog indicated that in January 2002 he was trained and certified in the use of the UltraLyte by HPD Sergeant Ryan Nishibun at the police academy. On November 4, 2010, Officer Ondayog attended a "refresher course" on the use of the UltraLyte that was taught by HPD Officers[.]
>
> Both the training at the police academy and the "refresher course" consisted of a four-hour "lecture class" on the mechanics of the UltraLyte and four hours of "practice." . . . [T]he course did not include a written or practical examination.
>
> Officer Ondayog testified that he received a manual as a part of his training. He did not indicate whether the manual that he had been given and used for comparison was a: (1) "Marksman instructor manual"; (2) "Marksman (trainee) manual"; (3) "LTI UltraLyte operator (user) manual"; or (4) "LTI Marksman operator (user) manual."
>
> The prosecutor asked Officer Ondayog if the instructions in the manual specified how to test the UltraLyte to verify that it was accurate and operating properly. . . .
>
> Over objection, Officer Ondayog testified that the instructions in the manual specified the tests to ensure that the UltraLyte is "working accurately and being operated properly," and his training in the use of the UltraLyte was based upon those instructions in the manual.
>
> Officer Ondayog stated that he was trained to conduct the following four tests in order to verify that the UltraLyte is working properly: (1) the "self-test"; (2) the "display test"; (3) the "scope alignment test"; and (4) the "delta distance velocity test" (delta/distance test) or the

"calibration test" (collectively "four tests")[.[4]]

. . . .

On the date of the incident, Officer Ondayog performed the four tests on his UltraLyte before his shift, "in accordance with LTI's recommended procedures[.]" . . . Officer Ondayog testified that based on the results of the four tests he determined that the UltraLyte was in "good working condition." . . .

Officer Ondayog indicated that he operated the UltraLyte in accordance with his training and the manufacturer's recommended procedures when he triggered the UltraLyte on Amiral's vehicle. . . .

On cross-examination, Officer Ondayog testified that he did not have personal knowledge of (1) "any tests that can be conducted on the [UltraLyte] that the manufacturer recommends that ensures it's operating as intended[,]" (2) "how those tests worked[,]" or (3) the "internal operation of the [UltraLyte and] how it works." Officer Ondayog's knowledge of the four tests was based on his reading of the manual and his training.

132 Hawai'i at 172-74, 319 P.3d at 1180-82.

The Hawai'i Supreme Court held the foundation for admitting a laser gun speed reading was insufficient for the following reasons:

First, no evidence was presented showing that the manual relied upon by Officer Ondayog to perform the four tests actually set forth the manufacturer's recommended training requirements.

Although Officer Ondayog testified that his training conformed with the manufacturer's requirements because his training conformed with the manual, the contents of the manual as to those requirements were not established by the State. Thus, it is not possible to determine whether the manufacturer's recommendations were actually described in the manual, so that conformance with the manual would be equivalent to conformance with the manufacturer's recommendations.

Second, assuming that the manufacturer's recommendations were contained in the manual relied upon by Officer Ondayog, his conclusory statement that the manual conformed to the training he received did not describe the type of training stated in the manual.

Third, there was no other evidence to demonstrate that an officer learning to perform the four tests described by Officer Ondayog satisfies the manufacturer's training requirements. Consequently, the officer's description of the four tests did not identify the type of training

---

[4] Officer Ondayog described the tests in detail. Id. at 173, 319 P.3d at 1181.

> recommended by the manufacturer.
>
> Fourth, there is no indication in the record that the instructors of the training courses Officer Ondayog attended were actually certified by the manufacturer or had been trained by the manufacturer. Additionally, there was no evidence that the training course itself was approved by the manufacturer or was consistent with the manufacturer's requirements. Such evidence together with the Officer's learning to perform the four tests could have established the type of training the manufacturer recommended.

Id. at 178-79, 319 P.3d at 1186-87 (footnotes omitted); see also Assaye, 121 Hawai'i at 210-216, 216 P.3d at 1233-39; State v. Ramos, No. CAAP-12-0000138, 2014 WL 2694230, at *3-6, (Hawai'i App. Jun 13, 2014) (Mem. Op.).

Without the speed reading, there was insufficient evidence to support Michel's conviction for excessive speeding. See HRS § 291C-105(a)(1) and (2); State v. Manewa, 115 Hawai'i 343, 357-358, 167 P.3d 336, 350-351 (2007). Further, there is no other evidence in the record to support a lesser offense of exceeding the speed limit under HRS § 291C-102(a)(1). Cf. State v. Fitzwater, 122 Hawai'i 354, 378, 227 P.3d 520, 544 (2010).

In light of the above, we need not address Michel's remaining points of error.

Therefore, IT IS HEREBY ORDERED that the "Notice of Entry of Judgment and/or Order and Plea/Judgment," entered by the District Court of the First Circuit, Honolulu Division, on April 19, 2017, is reversed.

DATED: Honolulu, Hawai'i, October 24, 2018.

On the briefs:

Alen M. Kaneshiro,
for Defendant-Appellant.

Donn Fudo,
Deputy Prosecuting Attorney,
for Plaintiff-Appellee.

Chief Judge

Associate Judge

Associate Judge